UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          Docket No. 20-CR-403 (WFK)

ROBERT GALA,

                    Defendant.

**<u>SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT ROBERT GALA</u>**

Date of Service:  March 27, 2023         Jim Walden
                                         Alexander Kahn
                                         **WALDEN MACHT & HARAN LLP**
                                         250 Vesey Street, 27th Floor
                                         New York, NY 10281
                                         Tel: (212) 335-2030
                                         jwalden@wmhlaw.com
                                         akahn@wmhlaw.com

                                         *Attorneys for Robert Gala*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

   I.  EARLY LIFE AND FAMILY BACKGROUND...............................................2

   II.  STRUGGLE WITH SUBSTANCE ABUSE.....................................................4

   III. FDNY CAREER ...........................................................................................7

SENTENCING ANALYSIS...............................................................................................9

   I.  THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) CALL FOR A BELOW-GUIDELINES SENTENCE. ...........................................................9

       A.     The Nature and Circumstances of the Offense Warrant Leniency .................10

       B.     Robert's History and Characteristics Counsel for a Lenient Sentence ...........12

           i.    Lack of Criminal History .......................................................... 12

           ii.   Substance Abuse History ......................................................... 13

           iii.  Personal Characteristics and Family Support System .............................. 14

       C.     The Sentence Needs to Provide Robert with Effective Drug Treatment .........17

       D.     Further Incarceration is Unnecessary to Achieve Deterrence.........................18

       E.     The Public Does Not Need Protection from Robert .......................................20

       F.     A Shorter Sentence is Necessary to Avoid Unwarranted Sentencing Disparities ...............................................................21

   II.  ROBERT ACCEPTS RESPONSIBILITY AND HAS REMORSE FOR HIS ACTIONS. ...........................................................25

CONCLUSION...............................................................................................................27

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                             **Page(s)**

*Gall v. United States*,
    552 U.S. 38 (2007)....................................................................................... 10

*Pepper v. United States*,
    562 U.S. 476 (2011)..................................................................................... 12

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)....................................................... 12

*United States v. Bannister*,
    786 F. Supp. 2d 617 (E.D.N.Y. 2011) ...................................................... 19

*United States v. Bowens*,
    No. 15-CR-542 (VEC) (S.D.N.Y. Feb. 17, 2016) ............................... 24, 25

*United States v. Burton*,
    381 F. App'x 4 (2d Cir. 2010) ................................................................... 13

*United States v. Castillo*,
    No. 17-CR-413 (JMF) (S.D.N.Y Feb. 6, 2018) ....................................... 24

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)......................................................................... 9

*United States v. Corporan*,
    No. 15-CR-887 (AT) (S.D.N.Y. May 28, 2019) ....................................... 22

*United States v. Dokmeci*,
    No. 13-CR-00455 (JG), 2016 WL 915185 (E.D.N.Y. Mar. 9, 2016) ...................... 18

*United States v. Isa*,
    562 F. App'x 53 (2d Cir. 2014) ................................................................. 13

*United States v. Kennedy*,
    286 F. Supp. 3d 531 (E.D.N.Y. 2018) ....................................... 1, 2, 21, 22

*United States v. McGown*,
    No. 14-CR-85 (JPO) (S.D.N.Y. July 31, 2014) ................................... 22, 23

*United States v. Morales*,
    No. 16-CR-340 (JPO) (S.D.N.Y. Sept. 16, 2016)..................................... 23

*United States v. Reyes*,
    No. 19-CR-66 (LTS), 2021 WL 22717 (S.D.N.Y. Jan. 4, 2021)....................................... 10, 23

*United States v. Van Manen*,
    No. 18-CR-30-3 (PAC), 2022 WL 842989 (S.D.N.Y. Mar. 22, 2022) ................................. 13

**Statutes**
18 U.S.C. § 3553(a) ............................................................................................................. passim

## <u>INTRODUCTION</u>

Robert Gala ("Robert") is a 30-year-old former member of the New York City Fire Department ("FDNY") with no criminal history who committed an offense nearly six years ago to feed his longstanding opioid addiction.   We respectfully request that the Court impose a sentence of time served to be followed by a period of supervised release, during which Robert would be required to engage in a course of drug treatment.

Robert's addiction has been well-documented in this case.  He has battled substance abuse problems since he was 16 years old in high school.  Robert fully accepts responsibility for committing this robbery and for all the consequences that followed, including his loss of freedom.[1] Robert has now been detained since April 22, 2022, the first period of incarceration in his life, and it has served as a significant wakeup call for him.  In that time, Robert has remained sober, and his perspective concerning his recovery has matured.  Although drugs are surely available in the Metropolitan Detention Center in Brooklyn ("MDC"), as this Court is aware, he has stayed clean and has continued making use of the limited opportunities available there.  Our proposed sentence would provide Robert with the best chance to confront his opioid addiction, remain clean, and lead a law-abiding life.

Significant downward variances in robbery cases are particularly common where, as here, a defendant's longstanding addiction drives the criminal conduct.  For example, in *United States v. Kennedy*, the Honorable Jack B. Weinstein sentenced a defendant with a lifelong heroin addiction and lengthy criminal history, including two convictions for prior robberies, to 24 months upon a conviction for Hobbs Act Robbery, where the Guidelines range was 33 to 41 months, to be followed by screening for participation in a drug treatment program.  286 F. Supp. 3d 531, 534–

---

[1] Robert also submits a letter in his own words for the Court's consideration.  *See* Ex. 1.

35 (E.D.N.Y. 2018). There, the defendant aided an unidentified individual in an attempted robbery of a convenience store, during which the individual displayed a firearm and fired a shot which struck a wall in between two store employees. *Id.* at 532. Judge Weinstein explained that **"[t]he court has found that individuals suffering from addiction are often jailed for behavior directly related to the abuse, and they are not given sufficient help in controlling their addictions while incarcerated and after their release."** *United States v. Kennedy*, 286 F. Supp. 3d 531, 535 (E.D.N.Y. 2018) (internal quotation omitted) (citing Alternatives to Incarceration in the Eastern District of New York, Third Report to the Board of Judges, at 86 (Oct. 2017)). Unlike that case, Robert has no criminal history, he did not use any weapon (although he did impersonate a police officer), and his offense posed no significant risk of injury (and, in fact, no one was injured).

For the reasons stated in this submission, we request that the Court impose our proposed sentence, which is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

## **BACKGROUND**

## I.    **EARLY LIFE AND FAMILY BACKGROUND**

Robert was born and raised in the Gravesend neighborhood in Brooklyn, New York as the oldest of three children to Michael Gala and Vita Gala. By all accounts, Robert's family has always been close, supportive, and loving, and Robert had a happy childhood. Growing up, Robert adored and was protective of his younger twin siblings, Anthony (who is disabled) and Bianca. Robert's extended family also lived nearby and were a big part of Robert's life.

Robert's family has described him as a child as intelligent, charismatic, and independent. Robert's aunt on his mother's side, Theresa Dey, who lived a block away from Robert and "thinks of [Robert] as a son," explains that Robert was "gifted and intelligent beyond his years," "strove

for perfection in his schoolwork," and "had tons of friends." Ex. 2. Robert's aunt on his father's

side, retired New York City Criminal Court Judge Gerianne Abriano, describes:

> Robert always excelled in school, was very active in dance and loved animals! One
> thing that always impressed me was that Robert loved dance and did not care that
> it wasn't a typical boy activity. He was strong enough to be his own person! At
> family gatherings, he was always a great communicator, respectful and had a great
> sense of humor. He showed compassion when one of us was sick and simply had
> a wonderful heart!

Ex. 3.

> Robert's mother, Vita, recalls their special bond in Robert's childhood:

> Robert was asked to be part of a school play which required dancing. He wanted
> so much to excel in his role that he asked me to enroll him in dance lessons. I was
> shocked but quickly complied with his request. He continued to dance for years in
> both school performances and competitions. I would take Robert on many of these
> travel competitions alone and we spent much time mother and son bonding. It was
> easier for Robert to talk to me and there was nothing he wouldn't share with me.

Ex. 4.

Robert's family greatly values and has a long tradition of public service. His father has

had a 40-year career serving the city of New York—first as a police officer in the New York City

Police Department ("NYPD"), and for the last 36 years as a member of FDNY. Robert's

grandfather, Michael Gala, Sr., also served as a firefighter in FDNY for 32 years. Frank Dades, a

family friend and current FDNY Emergency Medical Technician ("EMT"), writes of Robert's

family: "Our families go back two generations of friendship. I know that the Gala family has put

in many years of service to New York City and are a v[e]ry close knit and honorable family." Ex.

5. From a very early age, Robert dreamed of following in his father's and grandfather's footsteps

to become a firefighter in FDNY.

For school, Robert attended Our Lady of Grace, a Catholic school in his neighborhood,

through eighth grade. There he played baseball and basketball. He then attended and graduated

3

from Edward R. Murrow High School in Brooklyn.  While in grade school, Robert consistently worked.  He held jobs at a local pizzeria and butcher shop, worked in construction, and shoveled driveways in his neighborhood.  Robert's father frequently took him to his firehouse, where Robert helped the firefighters.  His father explains:

> At the firehouse he would help the members with routine committee work such as mopping floors, cleaning the fire trucks, cleaning bathrooms and helping to prepare the meals.  At the fire scene he would help the members stretch and take up hose lines.  He loved being around the firefighters and the firehouse and I loved having him with me.  His dream was to be a New York City Firefighter.

Ex. 6.

Sadly, Robert's introduction to opioids at a young age upended his life and the promise he showed in his younger years.

## II.     STRUGGLE WITH SUBSTANCE ABUSE

Robert's battle with addiction began at the age of 16 when he was in high school.  His mother's friend told him that a local mom-and-pop pharmacy in his neighborhood, Harold's Pharmacy, was looking to hire a pharmacy technician.  Robert went in the next day, and the pharmacist, Anthony Paniccioli, hired him.  Robert's duties included counting pills and assisting the pharmacist to fill prescriptions.  This time coincided with the beginning of the opioid epidemic and the rise of oxycodone abuse in the country.  Robert recalls that customers regularly came into the pharmacy with multiple prescriptions for oxycodone in different people's names that Paniccioli filled in unorthodox ways—for example, putting large quantities oxycodone pills for multiple prescriptions in one bottle for a single customer.  Addicts constantly harassed Robert outside the store demanding that he get them oxycodone, which he declined to do.

Paniccioli was later prosecuted for fraudulently filling prescriptions.  In November 2021, Paniccioli pleaded guilty in New York County Supreme Court to a felony drug charge, Attempted Criminal Possession of a Controlled Substance in the Third Degree, pursuant to Penal Law §

4

110/220.16(1).  Paniccioli admitted to running a scheme from 2017 to 2019 (several years after Robert worked there) in which he forged prescriptions to obtain more than 50,000 30mg oxycodone pills from drug distributors, which he then resold for cash.  *See* Office of Special Narcotics Prosecutor for the City of New York, Press Release (Nov. 19, 2021), available at https://www.snpnyc.org/wp-content/uploads/2021/11/PressRelease_202111119_compressed-1.pdf.

Robert's exposure to oxycodone in this manner at a young age, in conjunction with his friends touting the drug, led him to trying oxycodone for the first time.  His use of oxycodone was sporadic at first—typically 3-4 times per month when he socialized with friends.  His usage soon increased to 6-7 oxycodone pills per day.  When he could no longer afford oxycodone pills, he transitioned to using heroin, which was cheaper and stronger—a pattern that repeated throughout his adult life.

In 2012, Robert told his parents that he had been using opiates, and, with their assistance, he voluntarily entered a 28-day in-patient rehabilitation program at Mirmont Treatment Center in Media, Pennsylvania.  Robert did not complete the program, and instead went to his grandmother's house where he got clean with the support of his family.  Robert maintained sobriety for 7-8 months.

In June 2013, as described below, Robert received an offer to join the FDNY Academy ("Academy").  Robert was using oxycodone and heroin again at the time but knew that he had to take a drug test at the start of the Academy, so he refrained from drug use for about two weeks leading up to the test.  His sobriety did not last, however, and he began using oxycodone and heroin again during the Academy.

After graduating from the Academy in September 2013, Robert sought help for his addiction from the FDNY Counseling Services Unit ("CSU").  CSU placed him in a 28-day in-patient treatment program at Geisinger Marworth Treatment Center in Waverly, Pennsylvania. Robert attended the program for two weeks but left before completing it.  He began using opiates again and, after 2-3 weeks, Robert recognized that he needed additional treatment.  He returned to Marworth, completed the 28-day program, and regained sobriety.

Robert maintained sobriety for about two years as he worked as an EMT in the Coney Island neighborhood in Brooklyn.  During this period, Robert was prescribed and took Vivitrol, an opiate blocker, which he found to be effective.  Unfortunately, this period of sobriety did not last. He relapsed in 2016 and again began using oxycodone, which led to daily heroin use.

On October 17, 2017, Robert voluntarily entered a 28-day rehabilitation program at the Long Island Center for Recovery in Hampton Bays, New York.  He completed the program and stayed clean until May 2019 when then-FDNY Commissioner, Daniel Nigro, asked Robert to resign from FDNY (which he did).  Robert felt directionless after losing his job and the FDNY career he had envisioned for himself, which led him to use oxycodone and heroin again.  In approximately June 2020, Robert began a methadone treatment program, which he continues today.

Following his arrest in September 2020 (the circumstances of which we describe below), Robert struggled to maintain sobriety for extended periods, as Pretrial Services has documented. Despite the relapse history Robert experienced during his term of pre-trial release (and the multiple chances that the Court gave him through various treatment programs), at the time he was kicked out of his last program Robert had made serious progress.  Robert maintained sobriety while at Samaritan Daytop Village ("SDV"), a residential in-patient program, from November 2021

through February 2022.  Robert relapsed when another patient offered him fentanyl, which that patient brought unlawfully into the facility.  A drug test revealed the use.  Robert quickly rebounded and maintained sobriety until he was terminated from the program in April 2022.[2] Robert completed all of his mandated courses while in the facility.  *See* Ex. 7.

Unfortunately, Robert could not capitalize on the treatment opportunities the Court provided him.  On April 22, 2022, Robert consented to remand following his most recent pretrial violation.  He openly apologized to the Court and Pretrial Services, expressing remorse that he had not taken advantage of the opportunities he was provided.  He stated:

> I just wanted to thank and also apologize to the Court.  Thank you for the multiple chances that you have given me thus far, and I'm sorry that it seems they may have gone to waste, although, it has given me some growth in this pursuit of my recovery. I hope that this time in jail, although it being my first time, will give me the opportunity to not only continue my sobriety, but time to reflect on, you know, my poor decisions.

Ex. 8 at 10.  The time that Robert has now spent in jail—nearly one year—has reinforced his motivation to live a fully sober life.  Robert has maintained sobriety, as well as an unblemished disciplinary record, while incarcerated, which serves as one of the longest periods of sobriety in his adult life.

## III.    FDNY CAREER

Beginning at age 10, Robert's father took him to the firehouse regularly.  Judge Abriano writes, "From the time Robert was a little boy, he idolized my brother (his Dad) and wanted to become a firefighter too! Being in a helping profession was always his goal."  Ex 3. Indeed,

---

[2] An SDV staff member observed Robert with a bottle of Gabapentin pills in his room, where two other patients were also present.  SDV later disclosed that the pills belonged to another patient, who had admitted that the pills were his.  Regardless, SDV terminated from the program all three individuals, including Robert, who were present inside of the room in which the pills were found. Robert had not taken any of the pills.  Gabapentin is a prescription medication, often used to treat seizures, and is not a controlled substance.

working at FDNY was all Robert ever wanted to do, and he proactively took steps to achieve that goal. While in high school, Robert completed a 5-month course to become certified as a New York State EMT. He took and passed the state certification exam. He then applied for an EMT position at FDNY. While his application was pending, he attended John Jay College of Criminal Justice with a focus on Fire Science and Emergency Management. Robert's aunt, Theresa, recalls the excitement Robert exuded after submitting his application.

> I remember when Robert applied to the FDNY and was put on the waiting list. He was beyond excited. He brought all of his EMT gear over to his grandmother's house with his family and was practicing taking everyone's blood pressure. He could not wait to join the FDNY.

Ex. 2. Robert completed his first year at John Jay, and during his second, FDNY offered him an opportunity to train and work as an EMT. In June 2013, he left John Jay and enrolled in the FDNY Academy. After completing the Academy, Robert served as an EMT for FDNY in Coney Island for six years.

Robert had many accomplishments from his FDNY career for which he is proud. Unsurprisingly, these memories all come from a period of extended sobriety from 2014 to 2015. Below are a few examples:

- Around 2015 when he was a second year EMT, Robert responded to a call for a 13-year-old boy who had jumped off a pier at Coney Island and hit his head on a rock. Robert ran down the beach to render aid. When Robert arrived, the boy was not breathing. Robert administered CPR at the scene and throughout the entire ride to the hospital. Robert and his partner were able to resuscitate the boy before they arrived at the hospital, and he recovered fully.

- In 2015, Robert responded to a call for a woman in labor. He and other EMTs attempted to rush her to the hospital, but they were not able to make it in time. They pulled over on the Belt Parkway. Robert, his experienced partner, and other EMTs helped her deliver the baby in the back of the ambulance on the side of the highway.

- Around 2014, Robert's first year on the job, Robert responded to a serious motorcycle accident where one of the riders had severed a few of his fingers. Robert and his partner

8

were able to control the bleeding, locate his fingers, put them on ice, and transport the patient to the hospital, where doctors reattached them.

- In 2014, Robert responded to a patient with dementia, who did not remember her name or know where she was. Robert was able to work with the patient to access her phone book and contact her son. Her son met them and accompanied them to the hospital.

During this period of sobriety, Robert showed what he is capable of when he has control of his addiction. He was a productive public servant who rose to the occasion in high pressure situations to assist people in need. His father explains that during this period, "Robert started turning back to the son we knew. He was working, eating right, going to the gym and engaging with his family. He looked great. This went on for well over a year when his past finally caught up with him. He was forced to resign from his job with the fire department spiraling him back into drug addiction." Ex. 6. Robert even inspired his cousin, Brittany Bove, to become an EMT in FDNY. She writes, "As we got older Robert was training to become an EMT for FDNY. I'll never forget the stories he shared with us about how he helped people and saved a baby. At the time I didn't know it but Robert later inspired me to want to help others as well." Ex. 9.

## SENTENCING ANALYSIS

## I.    THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) CALL FOR A BELOW-GUIDELINES SENTENCE.

Pursuant to a plea agreement, the parties stipulated to a Guidelines calculation of 33 to 41 months (*see* Dkt. 77 ¶ 2), and the U.S. Probation Office calculated the same range. *See* Presentence Report ("PSR") ¶¶ 21-32, 84. Although the Guidelines must be consulted, they are merely advisory and are not presumptively reasonable. *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008). Sentencing courts are free to sentence well below the Guidelines, and generally do. Indeed, in 2021,[3] judges in the Eastern District of New York imposed within-Guidelines sentences

_____

[3] This is the most recent year for which sentencing statistics are available.

9

in a mere 24.7% of cases and below-Guidelines sentences in nearly 70% of cases.  *See* U.S. Sentencing Commission Statistical Information Packet, Eastern District of New York (2021), at 12, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nye21.pdf (hereinafter "USSC Statistical Information Packet").

In rendering "an individualized assessment based on the facts presented," a sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a).  *Gall v. United States,* 552 U.S. 38, 50 (2007).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public, provide the defendant with needed medical care, and avoid unwarranted sentencing disparities; and the kinds of sentences available. 18 U.S.C. § 3553(a)(1)-(6).  The factors relevant to this case warrant a below-Guidelines sentence.

## A.    The Nature and Circumstances of the Offense Warrant Leniency

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense.  Robert fully appreciates the seriousness of the crime for which he stands convicted. Nevertheless, the nature and circumstances of the offense provide a compelling basis for leniency.

This case concerns an addict who committed a crime to obtain pills to feed his habit.  We doubt the Government would contest this conclusion, since Robert stole a single bottle of pills and then used them.  Robert's addiction clearly drove his actions, which, as outlined in greater detail below, courts have recognized as a factor favoring a below-Guidelines sentence.  *See, e.g., United States v. Reyes*, No. 19-CR-66 (LTS), 2021 WL 22717, at *1 (S.D.N.Y. Jan. 4, 2021) (imposing below-Guidelines sentence, including mandated post-release drug treatment, for defendant convicted of robbing a commercial establishment by threatening the use of a firearm, where

10

defendant had "ongoing substance abuse issues which date back to the age of 16 or 17 that were the immediate reason for the robbery" as well as mental health issues).

Here, Robert impersonated a plain-clothes police officer (meaning he was not in uniform but displayed a fake badge and a radio), restrained a man illegally trying to sell his prescription oxycodone, and made off with a single bottle of pills—the same substance that Robert has long abused. Robert did not use or display a dangerous weapon or take anything from the victim other than the pills. He left the victim with his wallet and cell phone, which the victim used to call 9-1-1. Additionally, the victim was not in any way injured.

Further, the robbery occurred in July 2017, over 5 years ago. In December 2017, the NYPD arrested Robert for the same robbery. Robert readily confessed, so his acceptance of responsibility is both genuine and long-standing. Despite the confession, the King's County District Attorney's Office declined to prosecute the case. Between 2017 and 2020, Robert achieved sobriety for an extended period and did not reoffend before the FBI arrested him in December 2020. The DA's Office declined to prosecute because the alleged victim lied to police about his attempt to illegally sell the pills and refused further cooperation. As fate would have it, Robert's father was involved in a public controversy at the time. Reporters then picked up on Robert's troubled history, including the arrest, and wrote articles that incorrectly implied that he received preferential treatment at FDNY and quoted the then-Brooklyn Borough President as calling on Robert to resign. *See, e.g.*, Nora Abramov and Avana Harry, "FDNY EMT technician still on the job after allegedly ignoring 911 calls, posing as police officer," PIX11 (Aug. 31, 2018), https://pix11.com/news/local-news/brooklyn/fdny-emt-technician-still-on-the-job-after-allegedly-ignoring-911-calls-posing-as-police-officer/. The FBI then picked up the case and, two years after the articles, arrested Robert.

11

The circumstances of the offense—the lack of weapon used, absence of injury to the victim, and stealing pills for personal use to feed an opioid addiction—counsel in favor of leniency.

**B.      Robert's History and Characteristics Counsel for a Lenient Sentence**

Under Section 3553(a)(1), the Court must also consider Robert's specific history and personal characteristics.  At sentencing, the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  As one court has explained: "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotation omitted).

### i.      Lack of Criminal History

Robert has no criminal history.  Presentence Report ("PSR") ¶ 35.  The PSR indicates an arrest history, but the first two arrests listed resulted in dismissals.  *See* PSR ¶¶ 38-39.  The third arrest listed was the first time Robert was arrested for the robbery that serves as the basis for the instant case.  *Id.* ¶ 40.  As noted above, the Kings County DA's Office declined to prosecute Robert following this arrest, and the FBI later arrested Robert again for the robbery in September 2020. Although the sentencing court may consider an arrest history as part of the defendant's background, the court may not "consider a prior arrest that led to a dismissal as a conviction." *United States v. Burton*, 381 F. App'x 4, 7 (2d Cir. 2010) (quoting *United States v. Ortiz*, 742 F.2d 712, 714 n. 3 (2d Cir. 1984).

ii.     **Substance Abuse History**

Robert's substance abuse problems, which have defined his adult life, counsel in favor of leniency.  Courts have routinely recognized a defendant's longstanding addiction as a reason for imposing below-Guidelines sentences for serious offenses.  *See, e.g.*, *United States v. Van Manen*, No. 18-CR-30-3 (PAC), 2022 WL 842989, at *3 (S.D.N.Y. Mar. 22, 2022) ("significantly-below-guidelines sentence" given where "substance abuse was a major factor in [defendant's] turning into a drug dealer" despite defendant having lengthy criminal history and not accepting guilt or showing remorse); *United States v. Isa*, 562 F. App'x 53, 55 (2d Cir. 2014) (upholding sentence "well below the advisory Guidelines range" for defendant convicted of drug trafficking offenses based on substance abuse history despite "seriousness of his offenses of conviction and his (lengthy) criminal history"); *United States v. Brady*, No. 18-CR-316 (PAC), 2020 WL 2512100, at *1 (S.D.N.Y. May 15, 2020)  (below-Guidelines sentence for defendant convicted of drug trafficking offenses, based on  "the fact that [defendant] had made considerable efforts to beat his own dependency on illegal substances, his lack of a prior criminal history, and the influence of [defendant's] own substance abuse on his behavior").   Even DOJ's own policies favor treatment over incarceration for addicts, especially victims of the opioid crisis, such as Robert.  *See* Department of Justice Office of Public Affairs, *Department of Justice Awards More Than $340 Million to Address Substance Use Disorders and Fight the Overdose Epidemic*, Oct. 14, 2022, *available    at*    https://www.justice.gov/opa/pr/justice-department-awards-more-340-million-address-substance-use-disorders-and-fight-overdose (hereinafter "Oct. 2022 DOJ Press Release").

Despite Robert's struggle with substance abuse, he has achieved much that he is proud of during periods of sobriety.  In particular, while working as an EMT, Robert sustained an extended period of sobriety from around 2014 to 2015, from which he has many memorable moments.  He routinely responded to emergency situations and rendered aid to people who had sustained serious

13

injuries.   As described in greater detail above, a few examples are illustrative of Robert's capabilities.  Robert successfully administered CPR to a non-responsive 13-year-old boy who had hit his head while jumping off a pier at Coney Island.  Robert assisted a team of EMTs in safely delivering a baby in an ambulance on the side of a highway.  Robert responded to a serious motorcycle accident in which one of the motorists had severed several fingers.  Robert rendered aid to the motorist and located his fingers, which doctors later successfully reattached.

During this period, Robert demonstrated that, when sober, he has the capacity to exhibit grace under pressure, display compassion to others, and work effectively in a team.

### iii.    Personal Characteristics and Family Support System

Robert has further demonstrated that in periods of sobriety he has been a loyal and loving family member, friend, and colleague.   The letters submitted by friends, family, and former colleagues who have known Robert at all stages of his life demonstrate the quality of Robert's character and establish that Robert has the support of many.

Even as a teenager, Robert served at times as a pillar of support for members of his family. For example, Robert's aunt, Theresa, explains how Robert was there for her in her "greatest time of need":

> I went through a tumultuous divorce with my former husband involving domestic violence.  Even as a young adult, Robert gave me support.  He spoke to me on the phone and sent text messages with me during this difficult time.  He was incredibly supportive and I will never forget it.  He would tell me, "You're beautiful, why don't you leave him?"  He always knew the right thing to say to me. On one occasion, he was at my house in Staten Island for a weekend.  My former husband became very angry at me for something and was yelling at me. Robert stepped in between us to protect me.  He always stuck up for me even when he did not have to.

Ex. 2.

In addition, Robert has been fiercely protective of his young brother, Anthony, throughout his life.  Anthony suffers from achondroplasia, a form of dwarfism, and has faced significant health

14

problems.  In 2006, Anthony underwent a life-threatening back surgery.  As his older brother, Robert took responsibility for assisting in his recovery—visiting him at Johns Hopkins Hospital frequently, helping him get dressed, and assisting with other physical needs.  Robert's father explains:

> In 2006 Anthony underwent back surgery at Johns Hopkins Hospital in Baltimore Maryland to adjust a curvature in his spine.  While in surgery Anthony went into respiratory arrest and spent six weeks in the intensive care unit, then an additional two months in the Kennedy Krueger rehabilitation Center near the hospital.  I tell this story because from the time of the birth of his brother and sister Robert was the perfect older brother, both protective and loving.  We also needed him to step up and help out at home during this trying time in our lives.  Being it helping his mother with chores around the house or helping me with projects he was always there and never put himself before others.  Robert was always very protective of Anthony and took him out often with his friends and he was never embarrassed by his brother's dwarfism and ensured that people respected and never made fun of his little brother.

Ex. 6.  Robert's Aunt, retired Judge Abriano, further describes:  "[W]hat stands out most is his love for his younger twin siblings . . .  He showered the twins with love and attention and relished his time with them.  The bond between Robert and the twins was undeniable."  Ex. 3.  To this day, Robert looks out for Anthony, even as his brother has become more self-sufficient.  Robert has introduced him to friends and made sure to include him and make him feel welcome in his social circles.  Thomas Cucco, who served with Robert as an EMT, explains: "I . . . remember how caring he was towards his younger brother . . .  Robert always made sure to include him in our group of friends and look out for him."  Ex. 10.

Former FDNY colleagues have also expressed unyielding support for Robert.  Cucco describes Robert in periods of sobriety as "the type of guy who would do anything for a friend," and he "never had a problem going out of his way for someone he loves.  He was unselfish, giving and reliable."  *Id.*  Michael Pagan, a mentor of Robert's at FDNY, writes, "Over the course of our time together working on the Ambulance I saw what I knew could be a leader on the job, we were

15

faced with many challenging situations together and I was always able to rely on Rob to rise to the occasion as well as a loyal and professional partner. I've seen Rob show compassion to people in need and perform his duties in some of the worst situations that you may find yourself facing." Ex. 11.

Gabrielle Lazzaro, a longtime friend from his neighborhood, has visited Robert at the MDC consistently during his incarceration and provides insight into Robert's current mindset. She writes, "Being put in jail has been the wakeup call Rob never knew he needed. He understands that there are consequences to his actions." Further, "[Robert] is so eager to get back to work and make up for lost time." Ex. 12.

Throughout his life, Robert has displayed kindness to others in ways that they cherish to this day. His cousin, Brittany Bove, writes:

> Robert has always looked out for me and made sure I was okay even when I didn't know it. I'll never forget when I was talking to my mom about how unhappy I was with the way I looked and Robert turned around and told me I was perfect the way I was. To this day I'll never forget how I felt at that moment hearing it from someone I looked up to.

Ex. 9. Robert's aunt, Theresa, describes her most recent fond memory of Robert at her daughter Samantha's wedding: "My husband, Dennis, walked Samantha down the aisle, but I did not have anyone to walk with me. Robert must have noticed because he came up to me and offered to escort me down the aisle, which he did. I was so touched that he thought to be with me on such an important day." Ex. 2.

Despite Robert's addiction, he maintains a strong support system. For example, Cucco describes Robert's family:

> During the time I have known Robert, I got to know Robert's family very well. When I worked with Robert, I saw his family frequently, and even joined them on a family vacation. I still stay in touch with them. His family is one of the most supportive families I have ever encountered. They have stuck by Robert through

16

many ups and downs and keep pushing and pushing to get him help.  It is easy to
see that they will give anything to get him on a clean or normal life path.

Ex. 10.  Robert's father writes, "Through all the heartache and pain I will continue to love and

support Robert with all my heart," (Ex. 6) and Robert's mother adds, "[W]e will support him for

the rest of our lives" (Ex. 4).

### C.      The Sentence Needs to Provide Robert with Effective Drug Treatment

Pursuant to Section 3553(a)(2)(D), the Court must consider the need for the sentence "to

provide the defendant with needed . . . medical care, or other correctional treatment in the most

effective manner."  Further incarceration is not the most effective way to treat Robert's lifelong

drug addiction.  Studies have shown that community-based drug treatment reduces drug use and

recidivism at greater rates than incarceration without such treatment.  *See* Chandler, R. et al.,

*Treating Drug Abuse and Addiction in the Criminal Justice System: Improving Public Health and*

*Safety*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Jan. 14, 2009, at 183.   Robert

repeatedly sought out treatment opportunities at the MDC, but none were offered, aside from

receiving methadone daily.  Although the Court afforded Robert multiple treatment opportunities

before his plea in this case, Robert's outlook on his recovery has matured after serving nearly a

full year at the MDC.  Receiving treatment from trained clinicians in an environment designed to

tackle the serious and multifaceted problem of drug addiction is the most effective way for Robert

to achieve sustained sobriety and reintegrate into society.

Moreover, the Department of Justice has increasingly recognized the critical need for

treating, rather than incarcerating, offending addicts. For example, former Deputy Attorney

General ("DAG") James Cole visited diversion programs in the Eastern District of New York and

stated that it was "just what I envision the criminal justice system [is] really supposed to be looking

like." *United States v. Dokmeci*, No. 13-CR-00455 (JG), 2016 WL 915185, at *9 (E.D.N.Y. Mar.

9, 2016).  In remarks at New York University School of Law, DAG Cole called for expanding "drug court, reentry and other related programs . . . not only [to] improve public safety and public health, but [to] protect and leverage taxpayer dollars, safeguard communities in need and assist individuals and families in crisis." *Id.*

More recently, in October 2022, the DOJ announced grant awards of over $340 million to combat the opioid crisis, including $52 million for the Bureau of Justice Administration's ("BJA") Adult Drug Court Discretionary Grant Program.  *See* Oct. 2022 DOJ Press Release.  In announcing the grants, Principal Deputy Assistant Attorney General Amy L. Solomon explained, "In making these awards, the Department of Justice is demonstrating its unqualified commitment to making prevention, treatment and recovery part of a unified response to ensure public safety and advance the overall health of our communities."  *Id.*  Further, BJA Director Karhlton F. Moore stated, "For too long, our justice system has been expected to absorb many of the unaddressed societal and behavioral health challenges and inequities laid bare by the ongoing and escalating substance use crisis. The resources we are making available today will enable us to address the fundamental issues underlying this epidemic and help contribute to communities that are safe, healthy and supportive."  *Id.*

In lieu of a longer prison sentence, Robert should be required to participate in substance abuse treatment as a condition of supervised release to be monitored by the Department of Probation.

### D.      Further Incarceration is Unnecessary to Achieve Deterrence

Section 3553(a)(2)(B) requires consideration of the need for deterrence.  Neither of the two types of deterrence—general deterrence and specific deterrence—justifies a substantial sentence in this case.

18

First, further imprisonment is unnecessary to achieve the goal of specific deterrence. Robert's current period of incarceration—nearly one year—more than serves the purposes of deterrence and punishment. Before this period, Robert had never been incarcerated, even for one day, in his life, and this experience has served as a significant wakeup call for him. It has reinforced his motivation to live a fully sober life. Importantly, Robert has maintained sobriety, as well as an unblemished disciplinary record, while incarcerated. This period of nearly one year—a significant period of incarceration for a first-time offender—has already served its purpose as a deterrent.

Moreover, "[c]ompelling arguments have been made that the deterrent value of a sentence is highest when the chances of its being administered are high and the offender is able to rationally consider the consequences of his or her actions. It appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies." *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) (citing Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011)). Critically, "[d]eterrent power of either type is reduced when potential offenders' reasoning ability is impaired due to alcohol or drug use." *Id.* (citing Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*, 2 (2010), *available at* https://webpage.pace.edu/jhumbach/Crim-SentencingProject%20ReportonDeterrence.pdf). The principle of specific deterrence does not counsel in favor of a harsher sentence here.

Second, some courts have recognized that longer prison sentences do not serve the principle of general deterrence. *See Bannister*, 786 F. Supp. 2d at 660 ("General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the justice system."). We have struggled to find federal cases analogous to Robert's in which

the Hobbs Act was used to prosecute an addict stealing a single bottle of pills for personal use. Although Robert's conduct meets the elements under the Hobbs Act, cases involving this fact pattern appear to typically be prosecuted in state courts. Indeed, when Robert was first arrested for this robbery in December 2017, the NYPD detectives brought the case to the Kings County DA's Office, not the U.S. Attorney's Office. The DA's Office declined to prosecute the case because the victim had lied to the police and refused cooperation. Here, the general public would be sufficiently deterred from committing similar offenses by seeing that Robert received a sentence of nearly one year in jail upon a conviction for a felony in federal court.

### E.      The Public Does Not Need Protection from Robert

Under Section 3553(a)(2)(C), the Court must assess the need for the sentence "to protect the public from further crimes of the defendant." Aside from the conviction in this case, Robert has no history of violence whatsoever and has not posed a risk to the community. Notably, the robbery in this matter occurred in July 2017—over five years ago. The FBI did not arrest Robert until September 2020. In that period, while at liberty and with no pending criminal matters against him, Robert committed no offenses. Further, Robert has committed no offenses since his arrest in 2020.

As described above, the robbery for which Robert stands convicted stems directly from his drug use. Robert understands that to lead a law abiding and productive life, he must achieve sustained sobriety. Although during the pendency of this case Robert relapsed several times, he has shown signs of progress. While at SDV from November 2021 through April 2022, he achieved sobriety for extended periods, was an active member in the community, volunteered daily in the kitchen to cook meals for a group of over 70 people, and productively engaged with his treatment providers. Importantly, since Robert was detained in April 2022, he has sustained his sobriety at the MDC and has a newfound perspective on his path to recovery.

20

### F.     A Shorter Sentence is Necessary to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) mandates that a sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In 2021, judges in the Eastern District of New York granted below-Guidelines sentences to defendants convicted of robbery in almost 90% of cases and sentenced only 10% of defendants within the Guidelines range. *See* USSC Statistical Information Packet at 16. Unlike Robert, many of those defendants had a criminal history and/or engaged in much more reprehensible conduct under much less redeeming circumstances. Robert is far from the median defendant in terms of his record and conduct. Therefore, a below-Guidelines sentence is warranted.

A few representative examples stand out as particularly relevant to the Court's consideration of its obligation to avoid disparity. For example, as referenced above, in *United States v. Kennedy* Judge Weinstein sentenced a defendant with a serious heroin addiction and lengthy criminal history, including two convictions for prior robberies, to 24 months upon a conviction for another robbery, where the Guidelines range was 33 to 41 months. 286 F. Supp. 3d 531, 534–35 (E.D.N.Y. 2018). There, the defendant aided an unidentified individual in attempting to rob a convenience store, during which the individual displayed a firearm and fired a shot in the vicinity of two store employees. *Id.* at 532. The court, recognizing that the defendant suffered from a longtime heroin addiction, had a "close-knit family," and had expressed a "genuine desire to overcome his addictions," imposed a below-Guidelines sentence despite his significant criminal

record and ordered that the defendant be screened for a drug court during his period of supervised release.  *Id.* at 534-35.

In *United States v. Corporan*, the court imposed a sentence substantially below the Guidelines range—60 months lower than the bottom end of the range—where the defendant, who had a lengthy criminal history, robbed a jewelry store of over $65,000 worth of jewelry by brandishing what appeared to be a firearm while a coconspirator tied up an employee of the store. Sentencing Hearing Transcript ("Sent. Hr'g Tr."), No. 15-CR-887 (AT), Dkt. 33, at 9, 12 (S.D.N.Y. May 28, 2019).  At sentencing, the court noted that the defendant had multiple prior periods of incarceration, which "have been ineffective in putting an end to [his] history of substance abuse.  This suggests that a shorter period of imprisonment along with placement in a residential drug treatment program would better serve the goals of specific deterrence and effectively provide correctional treatment." *Id.* at 13.

In *United States v. McGown*, the court imposed a sentence of over 40 months below the bottom end of the Guidelines range, where the defendant, who had a longstanding heroin addiction and a criminal history, was convicted of committing a string of five bank robberies over the course of several months by threatening the use of a firearm.  Sent. Hr'g Tr., No. 14-CR-85 (JPO), Dkt. 20, at 12-14 (S.D.N.Y. July 31, 2014).  At sentencing, the court explained that "it's clear that the defendant's heroin addiction is a major cause of where he is today, and he completely recognized that. . . The defendant's substance abuse dates back to when he was young, and he clearly needs treatment." *Id.*  Further, "the guideline range to some extent overstates the need particularly for specific deterrence, and the length of that term would be additional more time than is necessary between now and getting the treatment, the serious inpatient treatment that I think we all recognize he needs." *Id.* at 13.

In *United States v. Morales*, the court varied from a Guidelines range of 63 to 78 months in a case involving an attempted armed robbery and imposed an 18-month sentence followed by residential treatment for a defendant with serious substance abuse problems. Sent. Hr'g Tr., No. 16-CR-340 (JPO), Dkt. 22, at 4, 16 (S.D.N.Y. Oct. 28, 2016). The court explained:

> I am persuaded that the defendant's history of substance abuse and the disorder associated with that substance abuse were major contributors to Mr. Morales' commission of this offense as well as his prior offenses. And I agree with those judges in this district who have emphasized the need for real and effective drug treatment as the driving force behind what is an appropriate sentence in a case like this. . . Unfortunately, our system has not been willing or able to systematically provide for real and effective drug treatment rather than relying solely on the criminal justice system to address these situations. . . . [A]n extended period of residential drug treatment is essential to addressing the underlying problem. And indeed I believe that that is most likely to serve the purposes on a long-term basis of specific deterrence and protecting the public as well as the purpose of providing appropriate and effective treatment to the defendant.

*Id.* at 14-15.

In *United States v. Reyes*, the court imposed a sentence of more than 20 months below the Guidelines range for a defendant with a "significant criminal record" who "robbed a commercial establishment using the threat of a firearm." No. 19-CR-66 (LTS), 2021 WL 22717, at *1 (S.D.N.Y. Jan. 4, 2021). In particular, the court highlighted that the defendant had "ongoing substance abuse issues which date back to the age of 16 or 17 that were the immediate reason for the robbery," in addition to mental health issues. *Id.* As part of the sentence, the court also "imposed special conditions of supervised release requiring that he participate in a long-term residential substance abuse and mental health treatment program," to be followed by outpatient treatment. *Id.* (internal citations omitted). The court recognized that the defendant's prior periods of incarceration "had not served well the statutory goals of sentencing, and that the different approach of focusing on addressing [the defendant's] longstanding substance abuse and mental

health problems was the most effective way of breaking that cycle to protect the public and provide for his rehabilitation." *Id.* at 2 (internal quotation omitted).

In *United States v. Castillo*, the court varied significantly from the Guidelines by imposing a sentence of more than 50 months below the bottom end of the range, where the defendant, who had longstanding substance abuse issues and suffered from untreated mental health issues, committed a series of armed robberies. Sent. Hr'g Tr., No. 17-CR-413 (JMF), Dkt. 23, at 7, 22 (S.D.N.Y Feb. 6, 2018). At sentencing, the court explained that it was "persuaded that a sentence within the guidelines range here would be grossly excessive given the individual circumstances presented." *Id.* at 19. Further, the court stated that courts in "remarkably similar cases, that is cases involving multiple robberies . . . by people with serious mental health issues, serious substance abuse issues, have recognized that the guidelines call for grossly excessive sentences and defendants in the situation . . . would benefit more by mental health treatment and substance abuse treatment than being warehoused in an institution like a prison." *Id.* at 19-20. In turn, "society would benefit more from that than putting [the defendant] in jail for a significant period of time." *Id.* at 20.

In *United States v. Bowens*, the court imposed a sentence of 20 months, undercutting the probation department's recommendation of 72-months, which was already a substantial variance from the 151 to 188 month range calculated by probation. Sent. Hr'g Tr., No. 15-CR-542 (VEC), Dkt. 53, at 4, 14 (S.D.N.Y. Feb. 17, 2016). On multiple occasions, the defendant, who had a lengthy criminal history and had served prison terms previously, simulated having a firearm to rob cell phone stores. *Id.* at 12. On one occasion he threatened "don't fucking move before I blow your brains out." Complaint, No. 15-CR-542 (VEC), Dkt. 1, at 4 (S.D.N.Y. June 24, 2015). He also committed a purse snatching. *Id.* at 5. At the sentencing hearing, the court explained that

"[t]he fact that I believe his criminal conduct has been largely driven by untreated mental illness and drug addiction does not lessen the fear that the defendant caused to the employees of the store that he robbed repeatedly.  But the primary factor that drives the appropriate sentence in this case in my view is the need to get [the defendant] mental health and substance abuse treatment that he desperately needs."  Sent. Hr'g Tr. at 12.

The Court does not need to sentence Robert within the Guidelines to achieve sentencing parity to similarly situated defendants.  These examples demonstrate that courts have commonly imposed below-Guidelines sentences to defendants convicted of serious robberies and with lengthy criminal histories where they suffer from longstanding substance abuse problems.  Indeed, a below-Guidelines sentence brings Robert's sentence closer in line with the sentences of similarly situated defendants who committed robberies and other offenses under the cloud of drug addiction.

## II.   ROBERT ACCEPTS RESPONSIBILITY AND HAS REMORSE FOR HIS ACTIONS.

Robert has repeatedly accepted responsibility and expressed remorse for his conduct in this case.  He has not downplayed or diminished his role in the robbery.  First, upon both of his arrests in this case—in September 2017 by the NYPD and December 2020 by the FBI—Robert gave full, detailed confessions of the robbery to law enforcement.  Second, when given the opportunity, Robert has been candid and expressed remorse for his actions to the Court.  As noted above, at the April 22, 2022 bail revocation hearing, Robert consented to remand.  Respectfully, we doubt the Court sees many examples of this.  He addressed the Court himself, and expressed remorse for squandering multiple opportunities that the Court gave him to get drug treatment.  Robert stated: "I just wanted to thank and also apologize to the Court.  Thank you for the multiple chances that you have given me thus far, and I'm sorry that it seems they may have gone to waste, although, it has given me some growth in this pursuit of my recovery.  I hope that this time in jail, although it

25

being my first time, will give me the opportunity to not only continue my sobriety, but time to reflect on, you know, my poor decisions." Ex. 8 at 10.  In addition, on June 1, 2022 Robert provided a fulsome allocution of the facts of the robbery as part of his guilty plea.  Finally, Robert has demonstrated his acceptance of responsibility since entering his guilty plea by achieving and sustaining sobriety and maintaining a clean disciplinary record at the MDC.  He has even found ways to remain productive at the MDC by volunteering to cook meals for other inmates.

　　　With that in mind, Robert objects to the following portion of the PSR, which has also been repeated in Pretrial Services' violation memoranda:  "The defendant admitted to ongoing drug use and stated, 'if a judge is going to put me away for being a drug addict than [sic] there must be something wrong with the judge.'"  PSR at ¶ 3.  Robert has testified before this Court that he did not make the statement attributed to him to Pretrial Services and was misquoted.  On March 22, 2022, the Court held a bail revocation hearing, at which Robert provided sworn testimony and was subjected to cross examination by the government.  When asked about the above statement, Robert stated: "Those weren't the words I said. . . I said if the judge, Your Honor, feels that I belong in prison because of my addiction, I have no control over that.  Those are my exact words."  Ex. 13 at 36.  Contrary to the statement attributed to him, Robert respects the Court and takes responsibility for his actions.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should impose a sentence of time served to be followed by a period of supervised release during which Robert would be required to participate in drug treatment.

Dated:   New York, NY                      Respectfully submitted,
        March 27, 2023

                                     **WALDEN MACHT & HARAN LLP**

                           By:   */s/ Jim Walden*
                                    Jim Walden
                                    Alexander Kahn
                                    250 Vesey Street, 27th Floor
                                    New York, NY 10281
                                    Tel: (212) 335-2030
                                    jwalden@wmhlaw.com
                                    akahn@wmhlaw.com

                                    *Attorneys for Defendant Robert Gala*

27