UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,                  :
                                           :
              v.                           :     **MEMORANDUM & ORDER**
                                           :     20-CR-403 (WFK)
ROBERT GALA,                               :
                                           :
                        Defendant.         :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 1, 2022, Defendant pled guilty pursuant to a plea agreement to the sole count of an Indictment, charging him with Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a). The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to time served, to be followed by 2 years of supervised release, restitution, forfeiture, and a $100 mandatory special assessment.

**BACKGROUND**

On September 9, 2020, the Government filed a Sealed Complaint charging Defendant with robbery in violation of 18 U.S.C. § 1951(a). Compl., ECF No. 1. On September 15, 2020, the Honorable Magistrate Judge Lois Bloom arraigned Defendant on the Complaint and ordered him released on a $150,000.00 bond secured by one surety. Pursuant to the terms of his bail package, Defendant was ordered to refrain from (1) using or unlawfully possessing narcotic drugs or controlled substances unless prescribed by a licensed medical practitioner, (2) obstructing or tampering with substance abuse testing, and (3) violating any other laws. Order Setting Conditions of Release ("Order"), ECF No. 3, at 2.

On September 25, 2020, a grand jury returned a single-count Indictment charging Defendant with Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a). On October 8, 2020, Defendant was arraigned on the Indictment before the Honorable Magistrate Judge Peggy Kuo and

1

pled not guilty. At the time of his arraignment on the Indictment, Defendant was out on bond pursuant to the terms set forth by Magistrate Judge Bloom.

Defendant remained out of custody and under the supervision of Pretrial Services until April 22, 2022, following the Court's bail revocation hearing. The Court held this hearing after Pretrial Services informed the Court Defendant had violated the terms of his bail package by, *inter alia,* testing positive for illegal drugs, including cocaine, morphine, and fentanyl on twenty-six occasions. Pretrial Services Mem., March 11, 2022, ECF No. 42. Prior to the revocation hearing, the Court was also informed that Defendant had been terminated from his residential drug treatment program due to repeated non-compliance. Accordingly, and with Defendant's consent, the Court revoked Defendant's bail and remanded him into custody, where he remains. ECF No. 67.

On May 11, 2022, while in custody, Defendant requested a change of plea hearing. ECF No. 74. On June 1, 2022, Defendant pled guilty pursuant to a plea agreement to the sole count of the Indictment, charging him with Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a). Plea Agreement, ECF No. 77.

**DISCUSSION**

**I.     Background**

The Federal Bureau of Investigation ("FBI") led the investigation into the instant offense, which transpired during the evening of July 24, 2017, at 63rd Street between 17th and 18th Avenues in Brooklyn, New York. Presentence Investigation Report ("PSR"), ECF No. 88, ¶¶ 9-10. A subsequent New York City Police Department ("NYPD") investigation into this incident revealed, on this date, Defendant had approached a man, displayed a gold shield, ordered the man to place

his hands on the wall, restrained the man using disposable plastic handcuffs, and began searching the man's pockets. *Id.* ¶ 10. The NYPD investigation further revealed the victim had repeatedly asked Defendant why he was being placed under arrest. *Id.* Defendant said nothing in response. *Id.*

Law enforcement recovered surveillance footage from multiple sources depicting portions of this event. *Id.* ¶ 12. The NYPD then distributed this footage to several news outlets across the city in an attempt to identify the perpetrator depicted in the video. *Id.* Their efforts were ultimately successful. Officers received an anonymous tip from an individual who identified Defendant as the man displayed in the surveillance video. *Id.* Additionally, after viewing the surveillance footage, a NYPD detective who had previously arrested Defendant on July 21, 2017, for possession of an imitation pistol, unlawful use of a police emblem, and unlawful possession of handcuffs, identified Defendant as the perpetrator depicted in the video. *Id.* ¶ 13.

On October 19, 2017, a second NYPD detective presented a photo array containing an image of Defendant to John Doe, the victim of the instant offense. *Id.* ¶ 14. John Doe identified Defendant as the individual who had stopped and handcuffed him on July 24, 2017. *Id.* NYPD detectives arrested Defendant on December 1, 2017. *Id.* ¶ 15. While he was being processed at the 84th precinct, officers reported Defendant stated, "You know that the guy I robbed is a drug dealer, right? The news made it sound worse than it was. I was just in a bad place and figured he was a bad guy and I needed pills. I didn't think it out. I didn't think he would call the cops." *Id.* During an interview with police on May 7, 2019, Defendant detailed the incident further. *Id.* ¶ 16. He explained that on July 24, 2017, he had filled a prescription for 180 oxycodone pills at a Brooklyn pharmacy. *Id.* He stated the man he had approached—John Doe—was an associate of his who had made arrangements to sell the pills to another person (the "Buyer") for $20.00 per

3

pill. *Id.* He informed officers, the Buyer had asked John Doe to meet him in the area of 17th Avenue and 63rd Street in Brooklyn, New York, and as John Doe was walking to meet the Buyer, Defendant approached John Doe. *Id.* Defendant had what appeared to John Doe to be a police badge and radio. *Id.* Defendant admitted he subsequently ordered John Doe to get up against the wall and then cuffed John Doe's hands using plastic handcuffs, reached into John Doe's pocket, and took the prescription pill bottle containing 180 oxycodone pills. *Id.*

Despite Defendant's admission, the Kings County District Attorney's Office declined to prosecute, in part because their witness, John Doe, failed to make a corporal identification of Defendant as his assailant. *Id.* ¶ 15. However, on September 15, 2020, FBI agents arrested Defendant pursuant to a Complaint, charging Defendant with robbery for the incident involving John Doe. *Id.* ¶ 17. Following his arrest, Defendant made a video-recorded statement in which he confessed fully to committing the instant offense. *See* Addendum to the PSR, ECF No. 89; Def's Mem. at 29, ECF No. 91.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## II.  Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision. The Court has done so in this case.

The Sentencing Guidelines are merely advisory in light of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 264 (2005). Nevertheless, the Guidelines range is the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id* at 49. In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion." *Molina-Martinez v. United States,* 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and …the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). It addresses each in turn consistent with *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

**III.   Analysis**

    **A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

5

1.  **Family and Personal Background**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Defendant was born on August 24, 1992, in Brooklyn, New York. PSR ¶ 42. He was raised in an intact, middle-income household as one of three children born to the marital union of Michael and Vita Gala (née Bascone). *Id.* ¶¶ 42, 44. His father and mother remain married and continue to reside in Brooklyn. *Id.* ¶ 42. His father is employed with the New York City Fire Department ("FDNY") and his mother is a homemaker. *Id.* Defendant's two siblings, Anthony and Bianca Gala, are twins and also continue to reside in Brooklyn. *Id.* ¶ 43. Anthony has Achondroplasia, which is a hereditary condition in which the growth of long bones is restricted by ossification of cartilage, resulting in very short limbs and sometimes a face that is small in relation to the skull. He is otherwise healthy, as is Bianca. *Id.* Defendant's parents and siblings are aware of his involvement in the instant offense and remain supportive of him. *Id.*

Defendant has never married, nor does he have children. *Id.* ¶ 46.

2.  **Educational and Employment History**

Defendant graduated from Edward Amaro High School in Brooklyn in 2010. *Id.* ¶ 70. He enrolled at John Jay College in Brooklyn in 2011, where he studied fire science and emergency management. *Id.* Defendant was always eager to follow his father's footsteps and become a firefighter. While attending college at John Jay, Defendant completed an Emergency Medical Technician ("EMT") course with hopes of becoming EMT certified. *Id.* ¶ 69; *see also* Def's Mem. at 12. Defendant passed the state certification exam in 2012 and subsequently applied for an EMT position at FDNY. PSR ¶ 69; Def's Mem. at 12. Defendant was accepted into the FDNY's EMT

6

program during his second year of college, and in June 2013 he left John Jay to enroll in the FDNY Academy.  Def's Mem. at 12.

Defendant was employed as an EMT for FDNY from 2013 to May 2019.  PSR ¶ 75.  In 2018, while working for the FDNY, Defendant began to work parttime as a chauffeur with VIP Executive Services in New York City.  Id. ¶ 74.  After Defendant was asked to resign from the FDNY in 2019, he obtained employment as a sales associate with Par Funding, a position he held until March 2020.  Id.

### 3. Prior Convictions

Defendant has no prior convictions.  Id. ¶¶ 33-34, 36-37.  However, he was previously arrested twice before committing the instant offense.  Id. ¶¶ 38-39.  He was arrested in 2012 for use and possession with intent to use drug paraphernalia and possession of a controlled substance less than 50 grams of marijuana, but he was subsequently acquitted of all charges.  ¶ 38.  As the Court previously stated, in 2017, Defendant was arrested for possession of an intimidation pistol, unlawful use of a police emblem, and unlawful possession of handcuffs.  Id. ¶ 39.  These charges were ultimately dismissed upon a motion of the Richmond County District Attorney's Office.  Id. ¶ 39.  His additional arrests pertain to the incident underlying the instant offense.  Id. ¶ 40.

### 4. Medical and Mental Health

Defendant reported no history of physical, mental, or emotional health problems.  Id. ¶¶ 50-51.

### 5. **Substance Abuse**

The course of Defendant's life turned for the worse when he began using drugs. Indeed, much, if not all, of the hardship and trouble Defendant has experienced is in some way attributable to his addiction.

As is the unfortunate reality for many adults like Defendant who struggle with addiction, Defendant first started experimenting with narcotics as a teenager. *Id.* ¶ 52. He was 16 years old when he tried marijuana for the first time. *Id.* While he continued to experiment with this drug, and later with cocaine, his drug of choice has always been opiates. *Id.* ¶ 53.

Defendant was also 16 years old when he tried opiates for the first time. *Id.* He was first exposed to these drugs in high school, after he was hired to work as a pharmacy technician at Harold's Pharmacy, his local pharmacy. *Id.* Defendant's duties in this role included counting pills and assisting the pharmacist, Anthony Paniccioli, with filling prescriptions. *Id.* Notably, Defendant's employment at the pharmacy coincided with the beginning of the opioid epidemic and the rise of oxycodone abuse in the United States, a crisis which continues to wreak havoc on our communities. Indeed, Defendant recalled customers regularly came into the pharmacy with multiple prescriptions for oxycodone in different people's names, and Mr. Paniccioli would fill these prescriptions in unorthodox ways, mostly by putting large quantities of oxycodone pills for multiple prescriptions in one bottle earmarked for a single customer. *Id.* ¶ 53. Defendant himself described how he was often approached by the Pharmacy's addicted patrons in the parking lot, who would ask Defendant to obtain oxycodone for them as he was leaving work. *Id.* ¶ 54.

Notably, Paniccioli was later prosecuted for fraudulently filling prescriptions. In November 2021, Paniccioli pled guilty in New York County Supreme Court to a felony drug charge, Attempted Criminal Possession of a Controlled Substance in the Third Degree, pursuant

8

to Penal Law § 110/220.16(1). Def's Mem. at 8-9. Paniccioli admitted to running a scheme from 2017 to 2019 in which he forged prescriptions to obtain more than 50,000 30 mg oxycodone pills from drug distributors, which he then resold for cash. *Id.* (referencing Office of Special Narcotics Prosecutor for the City of New York, Press Release (Nov. 19, 2021), available at https://www.snpnyc.org/wp-content/uploads/2021/11/PressRelease_202111119_compressed-1.pdf.). Although Mr. Paniccioli's scheme of conviction began after Defendant had left his employ, Defendant explained its roots predate his employment at the Pharmacy. PSR ¶¶ 53-54.

Defendant's introduction to oxycodone at a young age, in conjunction with his friends touting the drug, led him to try the drug himself. *Id.* ¶ 56. He described his initial use of oxycodone as sporadic at first. *Id.* He typically used three to four times per month in social settings. *Id.* His usage soon increased to six to seven oxycodone pills per day. *Id.* Defendant explained when he could no longer afford oxycodone pills, he resorted to heroin, which was both cheaper and stronger. *Id.*

Defendant informed his parents of his opiate habit in 2012. *Id.* ¶ 57. With their assistance, he voluntarily entered a 28-day in-patient rehabilitation program at the Mirmont Treatment Center in Pennsylvania. *Id.* Although he did not complete the program, opting instead to get sober with the help of his family while living at his grandmother's home, Defendant succeeded in maintaining his sobriety for seven to eight months. *Id.* Unfortunately for him, this did not last.

Defendant admitted he used oxycodone and heroin throughout his time at the FDNY Academy in 2013. *Id.* ¶ 58. After he graduated, he sought help for his addiction once more, this time from the FDNY Counseling Services Unit ("CSU"). *Id.* ¶ 59. CSU placed him in a 28-day in-patient treatment program at Geisinger Marworth Treatment Center in Pennsylvania. *Id.* Defendant attended the program for two weeks but left before completing it as he had begun using

opiates again.  *Id.*  Less than one month later, he returned to Marworth, completed the 28-day program, and regained his sobriety.  *Id.*

Defendant remained sober for two years as he worked as an EMT in the Coney Island neighborhood of Brooklyn.  *Id.* ¶ 60.  Between 2016 and October 17, 2017, Defendant relapsed and began using oxycodone pills, which then led to daily heroin use.  *Id.* ¶ 61.  On October 17, 2017, Defendant voluntarily entered a 28-day rehabilitation program at the Long Island Center for Recovery in New York.  *Id.* ¶ 62.  He completed the program and remained sober until he resigned from FDNY in 2019 upon then-FDNY Commissioner, Daniel Nigro's request.  *Id.*

At the time he was asked to resign, Defendant's father, himself a member of the FDNY, was involved in a public controversy.  Def's Mem. at 15.  The defense maintains his father's troubles prompted an investigation into Defendant's own troubled past.  *Id.*  This inquiry revealed Defendant had been the subject of an investigation led by the Department of Investigation ("DOI"). The DOI determined Defendant, while employed with the FDNY, had reportedly  flagged himself for fake calls to get out of responding to emergency ambulance runs and forged his partner's signature as part of his coverup, acts which his partner at the time corroborated.  PSR ¶ 75. Reporters learned of the investigation into Defendant and Defendant's drug habit, which prompted the FDNY Commissioner to request Defendant's resignation.  *Id.*; *see also* Def's Mem. at 15 (referencing Nora Abramov and Avana Harry, "FDNY EMT technician still on the job after allegedly ignoring 911 calls, posing as police officer," PIX11 (Aug. 31, 2018), https://pix11.com/news/local-news/brooklyn/fdny-emt-technician-still-on-the-job-afterallegedly-ignoring-911-calls-posing-as-police-officer/.).  The FBI began their investigation into Defendant following his forced resignation.

Defendant recalled feeling directionless after he lost his job and the FDNY career he had long envisioned for himself. PSR ¶ 63. He explained this feeling led him to resume using oxycodone and heroin. *Id.* The Defendant continued using even after the FBI arrested Defendant for the instant offense.

From Defendant's initial arraignment until the present, Defendant has been the subject of six violation memoranda and one status report, all related to his noncompliance with drug treatment and his continual use of illicit substances while engaged in both outpatient and residential drug treatment services. *Id.* ¶ 2; *see also* ECF Nos. 8, 9, 13, 29, 42, 65 (Defendant's pretrial violation memoranda); ECF No. 17 (Defendant's status report). The sixth and final report, dated April 21, 2022, resulted in this Court calling a bail revocation hearing, at which the Court, with Defendant's consent, revoked Defendant's bail and remanded him into federal custody. PSR ¶ 8; Order of Detention, ECF No. 68; Order Revoking Defendant's Bond, ECF No. 71.

Defendant has maintained his sobriety since he began his instant incarceration at the Metropolitan Detention Center ("MDC"). PSR ¶¶ 63, 68; Def's Mem. at 23. Defendant began participating in a methadone treatment program, which he continues to this day. PSR ¶ 63. Free from drugs, Defendant has held a steady position in the facility's food services area and has kept an unblemished disciplinary record. *Id.* ¶ 47; Def's Mem. at 23.

### 6. Nature and Circumstances of the Offense

The Court's previous statements make clear the nature and circumstances surrounding the instant offense. *See supra* at Section I.

### B. The Need for the Sentence Imposed

11

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Government, Probation, and the defense each address this factor in their sentencing memoranda. The Government and Probation urge the Court not to overlook the "undoubtedly serious" nature of Defendant's crime. Gov't Mem. at 4; Probation's Recommendation, ECF No. 88-1 at 2 (referencing "the heinous nature of [Defendant's] conduct.").

The Government notes, as this Court has previously described, the Defendant committed the instant offense under "the guise of legal authority"; "defendant deliberately sought out the Victim, pushed and physically restrained him, and stole straight from his pockets." Gov't Mem. at 4. The Government and Probation acknowledge Defendant's history of substance abuse and the role his addiction played in the instant offense. Probation expressly acknowledged "defendant's motivation for committing the instant offense was based on his need to obtain illicit substances to satisfy his own addiction . . . ." Probation's Recommendation at 2.

The Government asks the Court to consider the importance of deterrence, considering it "is particularly important here, since the conduct was carefully planned." Gov't Mem. at 5 (referencing Defendant's July 21, 2017, arrest for possession of an imitation pistol, unlawful use of a police emblem and unlawful possession of handcuffs, *see* PSR ¶ 39). The Government argues the Defendant's "conduct was no mistake; he was prepared and he had stocked up on just the sort of paraphernalia that would permit him to impersonate a law enforcement officer convincingly."

*Id.*  The Government further states, "[c]ritically, his arrest on July 21, 2017 did not deter him from committing the instant conduct on July 24, 2017." *Id.*

The defense argues "[n]either of the two types of deterrence—general deterrence and specific deterrence—justifies a substantial sentence in this case." Def's Mem. at 22.  As to specific deterrence, the defense argues the Defendant, a first-time offender having been incarcerated for the instant offense for nearly one year, has had "a significant wakeup call." *Id.* at 23.  The defense argues the deterrent value of Defendant's incarceration over the past year is particularly high in Defendant's case as he has spent ample time considering the consequences of his actions.  *Id.* (referencing *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) (citing Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011)); Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*, 2 (2010))).

The defense also argues Defendant, aside from the instant offense, has no history of violence and has never posed a risk to the community. *Id.* at 24.  The defense argues the public does not need protection from Defendant.  *Id.*  The defense argues the robbery the Defendant admitted to committing arose from his drug use. The Defendant has sustained sobriety throughout his period of incarceration; and between the offense in 2017 and his arrest in 2020, while at liberty and with no pending criminal matters against him, Defendant committed no further offenses.  *Id.*

The defense also argues further incarceration is not the most effective way to treat Defendant's lifelong drug addiction. *Id.* at 21 ("Receiving treatment from trained clinicians in an environment designed to tackle the serious and multifaceted problem of drug addiction is the most effective way for Robert to achieve sustained sobriety and reintegrate into society.").  In support of this point, the defense argues, "the Department of Justice has increasingly recognized the critical

13

need for treating, rather than incarcerating, offending addicts." *Id.* (referencing *United States v. Dokmeci*, 13-CR-00455 (JG), 2016 WL 915185, at *9 (E.D.N.Y. Mar. 9, 2016) (Gleeson, J.); Department of Justice Office of Public Affairs, *Department of Justice Awards More Than $340 Million to Address Substance Use Disorders and Fight the Overdose Epidemic*, Oct. 14, 2022, *available at* https://www.justice.gov/opa/pr/justice-department-awards-more-340-millionaddress-substance-use-disorders-and-fight-overdose).

The arguments of the Government, Probation, and the defense address the factors in this case that weigh both in favor and against imposing a lengthy term of incarceration here. The Court agrees with the Government and Probation that Defendant's crime of conviction is grave. Robbery, especially combined with the impersonation of law enforcement, is a serious offense. The Court acknowledges the role Defendant's addiction played in fueling this offensive conduct, and the Defendant's need for continual drug treatment. The Court expects the Defendant to maintain his current path of sobriety and to successfully combat the long-lasting drug addiction that has consumed his adult life, and which has nearly destroyed the career, and the life he envisioned for himself and worked hard to achieve.

The sentence the Court imposes today reflects and balances these considerations.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of Hobbs Act Robbery in violation of 18 U.S.C. § 1951(a). Defendant faces various penalties for having committed this offense, including terms of imprisonment and supervised release in addition to fines and a special assessment.

Specifically, Defendant faces a maximum term of imprisonment of 20 years, and no minimum term of imprisonment. 18 U.S.C. § 1951(a). Pursuant to 18 U.S.C. § 3583(b)(2), Defendant faces a term of supervised release of not more than three years. Furthermore, the Court may impose a fine of not more than $250,000.00 pursuant to 18 U.S.C. § 3571(b). Defendant also faces forfeiture as set forth in the Indictment and in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The Court is also required to impose restitution in an amount to be determined by the Court pursuant to 18 U.S.C. §§ 3663A and 3664, as well as a mandatory special assessment of $100.00 per court in accordance with 18 U.S.C. § 3013.

### D.     The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

All parties agree Defendant has a total adjusted offense level of 20, a criminal history score of zero, a criminal history category of I, and a recommended Guidelines range of imprisonment of between 33 and 41 months. *See* PSR ¶ 84, Gov't Mem. at 3; Def's Mem. at 13. Indeed, the defense stipulated to this calculation pursuant to the plea agreement. Def's Mem. at 13; *see also* Plea Agreement at 2-3, ECF No. 77. The parties reach this calculation based on the following:

The applicable Guideline for Hobbs Act Robbery offenses in violation 18 U.S.C. § 1951(a) is USSG §2B3.1. This provision provides a base offense level of 20. USSG §2B3.1. Two levels are added pursuant to USSG §2B3.1(b)(4)(B) since a victim was physically restrained to facilitate the commission of the offense or to facilitate escape. One additional level is added pursuant to USSG §2B3.1(b)(6) since the taking of a controlled substance was the object of the offense. This

15

results in a subtotal adjusted offense level of 23. The offense level is decreased by two levels pursuant to USSG §3E1.1(a) since Defendant has clearly demonstrated acceptance of responsibility for the offense. The offense level is decreased by one additional level pursuant to USSG §3E1.1(b).2 because the Government was notified in a timely manner of Defendant's intention to enter a plea of guilty. This results in a total adjusted offense level of 20. *See* PSR ¶¶ 22-32.

Defendant has no prior criminal convictions. *Id.* ¶¶ 33-34. As such, his total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I. *Id.* ¶ 35.

Based upon a total adjusted offense level of 20 and a criminal history category of I, the recommended Guidelines range of imprisonment range is 33 months to 41 months. *Id.* ¶ 84.

The Government submits a sentence of 33 months' imprisonment, or a sentence at the low end of the Guidelines range, is sufficient but not greater than necessary under the circumstances in this case. Gov't Mem. at 4. Probation agrees. Probation recommends the Court impose a sentence of 33 months' imprisonment to be followed by a term of 2 years' supervised release with special conditions. Probation's Recommendation at 1.

The defense takes a different view. Although the defense stipulated to the aforementioned Guidelines calculation, they urge the Court to impose a below Guidelines sentence. Specifically, the defense asks the Court to impose a sentence of time served to be followed by a period of supervised release. Def's Mem. at 5.

In addition to the reasons discussed above, defense counsel addresses several other factors they believe warrant a below-Guidelines sentence. *Id.* at 14. They claim Defendant appreciates the seriousness of the crime for which he stands convicted, while also stating the "circumstances

16

of the offense—the lack of weapon used, absence of injury to the victim, and stealing pills for personal use to feed an opioid addition—counsel in favor of leniency." *Id.* at 16.

The defense also notes Defendant has no criminal history aside from the instant offense and reiterate Defendant has consistently expressed ownership and remorse for his wrongdoing. *Id.* at 29; *see also* April 22, 2022, Bail Revocation Hearing Tr., Exhibit 8 at 10, ECF No. 91-1 (Defendant stating: "I just wanted to thank and also apologize to the Court. Thank you for the multiple chances that you have given me thus far, and I'm sorry that it seems they may have gone to waste, although, it has given me some growth in this pursuit of my recovery. I hope that this time in jail, although it being my first time, will give me the opportunity to not only continue my sobriety, but time to reflect on, you know, my poor decisions."); Defendant's Letter, ECF No. 91-1 ("I would like to apologize for my actions…I am ultimately the only one at fault…[m]y mindset with regard to taking accountability is the same as it was back [at the time of Defendant's arrest], which is being open and truthful and ready to face whatever the consequences may be for my actions…[m]y eyes are completely open to the reality of where I will ultimately end up if I don't continue following the tenets of the program I learned in treatment.").

Moreover, the defense asks the Court to consider Defendant's personal characteristics as well as his family support system as mitigating factors. Def's Mem. at 18. Indeed, the defense includes numerous letters from Defendant's friends, neighbors, and coworkers, ECF Nos. 91-5, 10, 11, 12, and his family, ECF Nos. 91-2, 3, 4, 6, 9, in its sentencing memorandum—each of whom attest to Defendant's strong moral character, his selflessness, his kindness, and his compassion for others. Many of Defendant's loved ones who wrote on his behalf also discuss the regrettable fact Defendant has long struggled with drug abuse. *See, e.g.*, Cucco Letter, ECF No. 91-10 (Defendant's friend and former colleague at FDNY: "I feel that if Robert could get rid of

17

this disease, he would be back on the same track he was on when we worked together."); Lazzaro Letter, ECF No. 91-12 (Defendant's friend and neighbor: "I have seen Rob sober, and I have also seen him struggle with his addiction. When Rob is sober, he lights up any room he walks into, he would give a stranger the shirt off his back and the money in his pockets…Rob is not a criminal, Rob is sick. Addiction, as you well know, is a disease.").

The Court has considered this all.  The Court greatly appreciates the support Defendant's loved ones have shown by writing to the Court on Defendant's behalf.  The Court also commends Defendant for the work he has done, and for that which he must continue to do, towards achieving his sobriety.  What is profoundly clear is the devasting effect drugs, particularly opiates, have had on this Defendant's life—as with the lives of so many in our community and across our nation who have similarly fallen victim to the opioid epidemic.  It is this Court's sincerest hope Defendant can maintain his sobriety.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission."  18 U.S.C. § 3553(a)(5).  Neither party has drawn such a statement to the Court's attention.  Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

18

The defense argues a below-Guidelines sentence would, in effect, bring Defendant's sentence closer in line with the sentences of similarly situated defendants who committed robberies and other offenses under the cloud of drug addiction. Def's Mem. at 29. The defense brings to the Court's attention several cases in which courts within this Circuit have imposed below-Guidelines sentences when drug addiction appeared to be the impetus behind the offense of conviction. *Id.* at 25-29 (referencing *United States v. Kennedy,* 286 F. Supp. 3d 531, 534–35 (E.D.N.Y. 2018) (Weinstein, J.); *United States v. Corporan,* 15-CR-887 (AT) (S.D.N.Y. May 28, 2019); *United States v. McGown*, 14-CR-85 (JPO) (S.D.N.Y. July 31, 2014); *United States v. Morales,* 16-CR-340 (JPO) (S.D.N.Y. Oct. 28, 2016); *United States v. Reyes,* 19-CR-66 (LTS), 2021 WL 22717, at *1 (S.D.N.Y. Jan. 4, 2021); *United States v. Castillo,* 17-CR-413 (JMF) (S.D.N.Y Feb. 6, 2018); *United States v. Bowens,* 15-CR-542 (VEC) (S.D.N.Y. Feb. 17, 2016)). In so doing, the defense argues "these examples demonstrate that courts have commonly imposed below-Guidelines sentences to defendants convicted of serious robberies and with lengthy criminal histories where they suffer from longstanding substance abuse problems." *Id.* at 29. And they note again, this Defendant has no prior criminal history.

### G.     The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires this Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Restitution in this case is mandatory pursuant to 18 U.S.C. § 3663A. However, as the victim has yet to provide the loss suffered for this offense, restitution is presently indeterminable.

Nevertheless, the Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to hold an evidentiary hearing within 90 days after this sentencing to determine the specific amount owed to the victim.

## IV. CONCLUSION

For the reasons set forth above, the Court determines a sentence of time served to be followed by 2 years of supervised release with special conditions, restitution in an amount to be determined by the Court, forfeiture in accordance with the terms set forth in the Indictment, and a $100.00 mandatory special assessment is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court does not impose a fine because Defendant appears unable to pay a fine.

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 3, 2023
Brooklyn, New York